UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SAMUEL SWEET,

     Applicant,

v.                                     CASE NO. 8:20-cv-1832-SDM-CPT

SECRETARY, Department of Corrections,

     Respondent.

_____/

## ORDER

     Sweet applies under 28 U.S.C. § 2254 for a writ of habeas corpus (Doc. 1) and challenges his convictions for first-degree murder, attempted robbery, and tampering, for which Sweet is imprisoned for life. Numerous exhibits (Doc. 12-2) support the response. (Doc. 12) An earlier order determined that the application is timely (Doc. 11), and the respondent argues that ground two is unexhausted and procedurally barred. (Doc. 24 at 47–50)

## I. BACKGROUND[1]

     On September 10, 2011, a group of musicians performed at Jessie's Bar in Winter Haven, Florida and stood in an alley behind the bar during a break. (Doc. 12-2 at 1081–86, 1099–1100, 1120–21, 1227) A young male approached the musicians, pointed a revolver at them, told them to lie down on the ground, and

---

[1] This summary of the facts derives from the briefs on direct appeal (Doc. 12-2 at 828–32) and the trial transcripts.

demanded money.  (Doc. 12-2 at 1086–88, 1100–04, 1121–24)  Although the musicians lay down on the ground, none had money.  (Doc. 12-2 at 1088–89, 1093–94, 1104–06, 1124–27)  A drunken male stumbled from the bar and into the armed robbery.  (Doc. 12-2 at 1091, 1108, 1128, 1179–82)  The robber, cocking the hammer, pointed the revolver at the drunken male, who slapped the revolver, which fired and killed Ralph Ameduri, one of the musicians on the ground.  (Doc. 12-2 at 1108–10, 1128–30, 1183–84, 1255–57, 1465)  The robber ran from the alley, across the street, and toward a church.  (Doc. 12-2 at 1220–22, 1238–41)

At the police station, Ryan Smith, another of the musicians in the alley, described the robber's face to a sketch artist, who drew a likeness of the robber. (Doc. 12-2 at 1132–33)  At trial Smith identified Sweet as the robber.  (Doc. 12-2 at 1134–36)

A detective spoke with a confidential informant who identified Sweet, Eric Johnson, Alex Monpremiere, and Caleb Crawley as participants in the homicide. (Doc. 12-2 at 1270–74)  During the homicide, a mobile telephone that belonged to Johnson connected to a mobile telephone tower near the scene of the homicide. (Doc. 12-2 at 1272–74, 1487–98)  Also during the homicide, a video camera near the scene of the homicide recorded a blue Ford Fusion that belonged to Crawley's mother.  (Doc. 12-2 at 1069–70, 1266)

After the grand jury indicted Sweet, the detective interrogated Sweet. (Doc. 12-2 at 1286–87)  Sweet waived his constitutional rights, the detective showed Sweet pictures of the alley where the homicide occurred, and Sweet began to breathe

heavily and stutter.  (Doc. 12-2 at 1290–91)  The detective asked Sweet whether he recognized the area in the photographs, and Sweet responded that he did not. (Doc. 12-2 at 1291–92)  The detective arrested Sweet for first-degree murder, and Sweet responded by turning over the photographs, pushing and pulling himself back and forth, and repeating, "No, no, no."  (Doc. 12-2 at 1292–93)  After the detective placed Sweet in a jail cell, Sweet dropped to his knees and began to pray ("Please, God, forgive me, help me.").  (Doc. 12-2 at 1293–94)

Crawley and Monpremiere testified at trial, and the trial court admitted into evidence grand jury testimony by Johnson.[2]  Just before the homicide, Crawley drove Sweet, Monpremiere, and Johnson around Winter Haven.  (Doc. 12-2 at 1308–12, 1317–18)  A couple of days earlier, Sweet showed Johnson a revolver that Sweet had purchased.  (Doc. 12-2 at 1397)  The evening of the homicide, Crawley saw Sweet armed with the revolver.  (Doc. 12-2 at 1313–15)  Sweet told Crawley, Monpremiere, and Johnson, "I need money," and "I'm going to hit a lick." (Doc. 12-2 at 1316–17, 1340–42, 1395–96)  When Crawley drove near the bar, Sweet told Crawley to stop the car and exited the car.  (Doc. 12-2 at 1318–19, 1342–43, 1396–97)  As he started to drive away, Crawley heard a gunshot, immediately after which Sweet ran back to the car and demanded that Crawley leave.  (Doc. 12-2 at 1320–22, 1345–47, 1398–99)  A couple of days later, Crawley drove Sweet and the

_____

[2] Johnson denied remembering what occurred on the day of the homicide. (Doc. 12-2 at 1375–77) The trial court determined that Johnson feigned his memory loss and admitted Johnson's grand jury testimony as a prior inconsistent statement and substantive evidence. (Doc. 12-2 at 1381–82, 1390, 1428)

other males to a lake where Sweet disposed of a gun.  (Doc. 12-2 at 1323–24, 1348–49, 1401–03)

After the homicide, Sweet confessed to Johnson that he tried to rob several people with a gun, that a male tried to knock the gun out of Sweet's hand, and that the gun fired.  (Doc. 12-2 at 1404)  Sweet told Johnson that he stole only twenty-five dollars.  (Doc. 12-2 at 1405)  Johnson responded, "[W]ow, you killed somebody for twenty-five dollars . . . .  [Y]ou're real cold hearted."  (Doc. 12-2 at 1405)  Sweet replied, "I should have killed them all."  (Doc. 12-2 at 1405)

During the defense's case-in-chief, Sweet's mother, Sweet's sister, and Sweet's cousin testified that Sweet stayed home on the night of the homicide.  (Doc. 12-2 at 1502–04, 1508–09, 1517–19)  That week, the family stayed together because a doctor diagnosed Sweet's cousin with cancer and expected that she would die in two or three weeks.  (Doc. 12-2 at 1503, 1509, 1519)  Sweet, a convicted felon, testified that he stayed home on the night of the homicide and denied that he committed the crimes.  (Doc. 12-2 at 1528–30)

## II.  EXHAUSTION AND PROCEDURAL DEFAULT

The respondent argues that ground two is procedurally barred from federal review because Sweet failed to exhaust the claim.  (Doc. 24 at 47)  "[E]xhaustion of state remedies requires that petitioners 'fairly presen[t]' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights."  *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)).  "To provide the State with the

necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese,* 541 U.S. 27, 29 (2004) (citing *Henry*, 513 U.S. at 365–66).

**Ground Two:**

Sweet asserts that trial counsel deficiently performed by not presenting mitigating evidence at sentencing and by not arguing that factors in *Miller v. Alabama*, 567 U.S. 460 (2012), supported a mitigated sentence. (Doc. 1 at 8–9)  Sweet failed to raise this claim in his motion for post-conviction relief (Doc. 12-2 at 156–88) and in his brief on post-conviction appeal. (Doc. 12-2 at 874–902)  If Sweet returned to state court to raise the claim, the post-conviction court would deny the claim as procedurally defaulted.  Fla. R. Crim. P. 3.850(b), (h).  Consequently, the claim is procedurally defaulted in federal court.  *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998) ("[W]hen it is obvious that the unexhausted claims would be procedurally barred in state court due to a state-law procedural default, we can forego the needless 'judicial ping-pong' and just treat those claims now barred by state law as no basis for federal habeas relief.").

Ground two is barred from federal review absent a showing of either "actual cause and prejudice" or a "fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  Sweet asserts that, under *Martinez v. Ryan*, 566 U.S. 1 (2012), ineffective assistance of post-conviction counsel serves as cause to excuse the procedural default.  (Doc. 1 at 9–10)  "To overcome the default,

a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 566 U.S. at 14.

The jury found Sweet guilty of first-degree felony murder (Doc. 12-2 at 15), a capital felony that requires the imposition of a sentence of either death or life in prison without parole.  §§ 782.04(1)(a) and 775.082(1), Fla. Stat. (2011).  Because the homicide occurred when Sweet was seventeen, *Roper v. Simmons*, 543 U.S. 551 (2005), barred a sentence of death and *Miller*, 567 U.S. at 470, barred a mandatory sentence of life in prison without parole.  The trial court sentenced Sweet to life in prison with review under § 921.1402, Fla. Stat., after twenty-five years.  (Doc. 12-2 at 45, 708)

*Miller*, 567 U.S. at 477–81 (citations omitted), requires a trial judge to consider mitigating factors related to youth before sentencing a defendant, who commits a crime when he is a juvenile, to life in prison without parole:

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features — among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him — and from which he cannot usually extricate himself — no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth — for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.

. . .

> We therefore hold that the Eighth Amendment forbids
> a sentencing scheme that mandates life in prison without
> possibility of parole for juvenile offenders. By making youth
> (and all that accompanies it) irrelevant to imposition of that
> harshest prison sentence, such a scheme poses too great a risk
> of disproportionate punishment. Because that holding is
> sufficient to decide these cases, we do not consider Jackson's
> and Miller's alternative argument that the Eighth Amendment
> requires a categorical bar on life without parole for juveniles, or
> at least for those fourteen and younger. But given all we have
> said in *Roper*, *Graham*[3], and this decision about children's
> diminished culpability and heightened capacity for change, we
> think appropriate occasions for sentencing juveniles to this
> harshest possible penalty will be uncommon. That is especially
> so because of the great difficulty we noted in *Roper* and *Graham*
> of distinguishing at this early age between "the juvenile
> offender whose crime reflects unfortunate yet transient
> immaturity, and the rare juvenile offender whose crime reflects
> irreparable corruption." Although we do not foreclose a
> sentencer's ability to make that judgment in homicide cases, we
> require it to take into account how children are different, and
> how those differences counsel against irrevocably sentencing
> them to a lifetime in prison.

At sentencing, trial counsel presented testimony by Sweet's pastor, Sweet's

step-father, Sweet's aunt, and Sweet's mother (Doc. 12-2 at 974–87) and argued that

mitigating factors identified in *Miller* supported the imposition of a sentence of a term

of years followed by probation (Doc. 12-2 at 987–89):

> [Trial counsel:]     Your Honor, that concludes the
> presentation I would like to make [to] the
> court this morning. Mr. Sweet, if you can
> come over please. Your Honor, the court
> is well aware of the *Miller v. Alabama* case
> found at 132 Supreme Court cite 2455 and
> — I reserved my comments in the PSI for
> today. My comments to the court are
> going to be that before the court [is]

---

[3] *Graham v. Florida*, 560 U.S. 48 (2010).

someone [who] is older than seventeen, but at the time of the offense he was seventeen years old. And specifically what the Supreme Court and Florida courts have been looking at as far as sentencing of juveniles is — the mind, the maturity, and the character [of a] person less than eighteen years old[.] [We do not] want to be sentencing them to life in prison. And I'm going to be asking the court today to consider — sentencing him much less than a life sentence. I'm [not] going to be specifically — giving a number out to the court.

[B]ut — I think the court can consider all the mitigations in this case and the court can consider the facts and circumstances of this case. [T]his case was not charged under [the] premeditation theory. This case was charged under [the] felony murder theory in which the State is allowed to proceed on first-degree murder if there's an allegation that's proved that there was a felony committed during the course of the murder. However, the testimony that the court received at the trial — was that while the gun was pointed at four individuals, the gun was put down, then came back up when another individual walked out of the back of the bar, and it was slapped and it [ ] discharged.

[R]emember my argument during closing [ ] that if the jury believed that there was a murder committed that it was manslaughter as opposed to felony murder. Manslaughter carries a much different type of sentence than first-degree murder. That being said the jury found Mr. Sweet guilty of first-degree murder, but the court can consider facts and circumstances of what happened the night of September 10, September 11 to consider what an appropriate sentence would be. Along with mitigation

> regarding Mr. Sweet being seventeen
> years old at the time of the offense, and
> the mitigation the court has heard today,
> [ ] I am going to ask that the court
> consider a term of years with a period of
> probation, so the court can maintain
> supervision of Mr. Sweet.

Sweet asserts that trial counsel was ineffective for not retaining a mental health expert to evaluate him and testify at sentencing.  (Docs. 1 at 9 and 7 at 13)  However, Sweet does not submit a report by a mental health expert that contains a diagnosis or that explains the causal relation between the diagnosis and Sweet's commission of the crime.  Because "[s]peculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation," the claim is meritless.  *Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir. 1985).

Also, Sweet asserts that trial counsel was ineffective for not retaining a mitigation specialist to investigate his background and for not presenting mitigation evidence from the investigation.  (Docs. 1 at 9 and 7 at 12–15)  Sweet speculates that a mitigation specialist would discover that his father abused him when he was a child, that he received insufficient mental health treatment, and that he acted impetuously because of the lack of treatment.  (Doc. 7 at 13–14)  *Aldrich*, 777 F.2d at 636.  In the pre-sentence investigation report, the probation officer reported that Sweet denied that he suffered abuse when he was child.  (Doc. 12-2 at 1671)  Because Sweet knew about the abuse before sentencing but denied that he suffered abuse, trial counsel did not deficiently perform.  *Strickland*, 466 U.S. at 691

("Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.").

Lastly, Sweet asserts that trial counsel was ineffective for not presenting two reports published in 2009 and 2011 summarizing studies that demonstrated that an adolescent engages in riskier behavior when a peer observes the behavior. (Doc. 7 at 14)  However, evidence at trial proved that Crawley, Monpremiere, and Johnson sat in the car, while Sweet committed the crimes. Also, at sentencing, trial counsel presented testimony by Sweet's pastor, Sweet's step-father, Sweet's aunt, and Sweet's mother (Doc. 12-2 at 974–87) and argued that the testimony by the witnesses, the circumstances of the offense, and Sweet's young age at the time of the offense justified a sentence of a term of years followed by probation. (Doc. 12-2 at 988–89) Sweet speculates that the trial court would have imposed a lesser sentence if trial counsel had presented the minimally relevant reports.

Because trial counsel argued that factors related to youth justified a mitigated sentence and because Sweet fails to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," the claims are meritless. *Strickland*, 466 U.S. at 694. Because the claims in ground two are meritless, ground two is procedurally barred from federal review. *Martinez*, 566 U.S. at 14.

### III.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 governs this proceeding.  *Wilcox v. Fla. Dep't Corrs.*, 158 F.3d 1209, 1210 (11th Cir. 1998).  Section 2254(d), which creates a highly deferential standard for federal court review of a state court adjudication, states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
>> resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Williams v. Taylor*, 529 U.S. 362, 412–13 (2000), explains this deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. . . . Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 694 (2002). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Cone*, 535 U.S. at 693. "AEDPA prevents defendants — and federal courts — from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("This is a 'difficult to meet,' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt[.]'") (citations omitted).

When the last state court to decide a federal claim issues an explanatory and reasoned opinion, a federal habeas court reviews the specific reasons in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 138 S. Ct. 1188,

1192 (2018).  When the relevant state-court decision is not accompanied with reasons for the decision, the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning."  *Wilson*, 138 S. Ct. at 1192.  A respondent may contest "the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . ."  *Wilson*, 138 S. Ct. at 1192.

In a *per curiam* decision without a written opinion the state appellate court affirmed Sweet's convictions and sentences and later affirmed the denial of Sweet's Rule 3.850 motion for post-conviction relief.  (Doc. 12-2 at 52, 795)  A state appellate court's *per curiam* decision without a written opinion warrants deference under Section 2254(d)(1).  *Wright v. Sec'y, Dep't Corrs.*, 278 F.3d 1245, 1254 (11th Cir. 2002).  *Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

As *Pinholster* explains, 563 U.S. at 181–82, review of the state court decision is limited to the state court record:

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record

in existence at that same time, *i.e.*, the record before the state court.

"[A] determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  Sweet bears the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  The presumption applies to a finding of fact but not to a mixed determination of law and fact.  *Parker v. Head*, 244 F.3d 831, 836 (11th Cir. 2001).  Sweet's federal application presents the same grounds that he presented to the state court.  The state court's rejection of Sweet's claims warrants deference in this federal action.  (Doc. 12-2 at 190–99, 706–08)

## IV.  ISSUES ON DIRECT APPEAL

### Ground Three:

Sweet asserts that the trial court violated his federal right to due process by denying his motion to suppress testimony by Ryan Smith, the musician in the alley who identified Sweet as the robber.  (Doc. 1 at 11)  The trial court denied the claim as follows (Doc. 12-2 at 935–36):

> [Trial counsel:]  Your Honor, I disclosed to the State and the court the case I found in *White v. State* which can be found at 403 So. 2d 331. It's a 1981 case from the Florida Supreme Court which appears to be on point with the facts of our case. In that case — the defendant — was going to trial. [J]ust before his trial it was disclosed that there was a witness who hadn't been shown any — pre-trial line up by law enforcement. [The witness] — came forward and said I can identify the defendant. And the — point — discussed by the Supreme Court was whether or not the — pretrial —

publicity and other things that happened in the case — would have led to a taint of the in-court — identification. And the court ruled that it did not.

[N]otwithstanding the case, Your Honor, — we do have a case before us where a — a person — is going to go to trial. And we have a witness who hasn't been shown anything, but has viewed stuff on the internet. And he's making his in-court identification based upon that pre-trial publicity. So I would ask the court to grant the motion to suppress and deny the admissibility of the in-court — identification.

[Trial court:]    Based on my understanding of the law, the *White* case, what he is testified to today and the existence of the jury instruction addressing this, I think it goes to the weight of the testimony rather than the admissibility. I'm going to deny the motion to suppress.

"'[C]onvictions based on eyewitness identification at trial following a pre-trial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'"  *Neil v. Biggers*, 409 U.S. 188, 196–97 (1972) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). "An identification infected by improper police influence . . . is not automatically excluded.  Instead, the trial judge must screen the evidence for reliability pre-trial." *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012).

At the hearing on the motion to suppress, Smith testified that he and the other musicians stood in an alley behind the bar, a male approached the group, the male

quietly demanded that they lie on the ground, Smith looked at the male, who covered his face with a cloth, and the male pointed a gun at Smith and demanded that the group "get the f*ck on the ground." (Doc. 12-2 at 923) Smith and the robber stood five feet apart. (Doc. 12-2 at 923) While on the ground, Smith was "more or less" able to observe the robber. (Doc. 12-2 at 924)

After the robber left the scene, police spoke with Smith. (Doc. 12-2 at 925) Smith described the robber to a sketch artist, who prepared a picture of the robber based on Smith's description, and Smith described the picture as a fair and accurate depiction of the robber. (Doc. 12-2 at 926) In the courtroom, Smith identified Sweet as the robber. (Doc. 12-2 at 927) Smith clarified that "there's something that [the sketch artist] didn't quite get right with the eyes, but now that I see him here, I can see what it is you know." (Doc. 12-2 at 927) The picture depicts the robber's hair, eyes, ears, nose, and neck, and a cloth covering his mouth. (Doc. 12-2 at 206)

Smith denied that a police officer showed him a photographic lineup but testified that he viewed a photograph of Sweet on the internet (Doc. 12-2 at 928–29):

| [Prosecutor:] | Have you ever gone on the internet to do any sort of independent research regarding Sam Sweet? |
|---|---|
| [Smith:] | [T]he only [thing] that happened is that Frank — Frank Csomos who was one of the [ ] other witnesses [ ] he contacted me and sent me [a] link to an article online and I did view that one time. [B]ut I honestly didn't want to do much more research then[,] you know. |
| [Prosecutor:] | I'm going to show you some articles that have been marked for evidence in this motion hearing. They're defense one, two, |

and three. Do you recall if any of these might have been the article that you looked at?

[Smith:]                I think this is the one.

[Prosecutor:]       Okay. You're pointing out defense three. So you believe this might have been the article that you looked at?

[Smith:]                Yeah.

[Prosecutor:]       Okay. And it has a small photograph of Sam Sweet?

[Smith:]                Uh-huh.

[Prosecutor:]       Okay. Was there anything about this photograph or this article that [ ] caused you to have any recollection that you did not already have regarding Mr. Sweet?

[Smith:]                I'm in a — [it] kind of look[s] like him, but I don't know what to say other than that.

[Prosecutor:]       Did it reinforce the image that you had in your mind?

[Smith:]                Yeah.

[Prosecutor:]       That's their word, I don't want to put words in your mouth.

[Smith:]                Yeah.

[Prosecutor:]       Okay. But no other independent research or anything like that was done by yourself?

[Smith:]                No. And it was only just a brief glimpse at it. It just — you know [is a] kind of sad event in my life, so I didn't really want to dwell on it too much.

On cross-examination, Smith testified that he was not "one hundred percent" certain that the photograph in the newspaper depicted the robber and instead was "seventy-five [or] eighty" percent certain. (Doc. 12-2 at 931, 933)

In his motion to suppress, Sweet argued that pre-trial publicity, including the newspaper article that Smith viewed on the internet, tainted Smith's identification of Sweet in court. (Doc. 12-2 at 904–05, 935–36) However, *Perry*, 565 U.S. at 232–33, holds that federal due process bars the admission of an identification tainted only by a police officer's use of an unnecessarily suggestive procedure:

> We have not extended pre-trial screening for reliability to cases in which the suggestive circumstances were not arranged by law enforcement officers. . . . Our decisions [ ] turn on the presence of state action and aim to deter police from rigging identification procedures, for example, at a line-up, show-up, or photograph array.  When no improper law enforcement activity is involved, we hold, it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at post-indictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.

At trial, trial counsel cross-examined Smith about viewing Sweet's photograph in the newspaper article on the internet and argued in closing that Sweet's photograph on the internet tainted Smith's identification of Sweet. (Doc. 12-2 at 1581–86, 1595) The trial court identified factors that the jury must consider when evaluating a witness's testimony and instructed that the prosecutor had the burden to prove the crimes beyond a reasonable doubt. (Doc. 12-2 at 1625–29) Because Sweet did not assert that a police officer's use of an unnecessarily suggestive procedure tainted Smith's identification, the post-conviction court did not unreasonably deny

the claim. *United States v. Whatley*, 719 F.3d 1206, 1216 (11th Cir. 2013)

("*Perry* makes clear that, for those defendants who are identified under suggestive

circumstances not arranged by police, the requirements of due process are satisfied in

the ordinary protections of trial."). Ground three is denied.

## Ground Four:

Sweet asserts that the trial court violated his federal right to due process by

permitting the prosecutor to call Eric Johnson to testify and by admitting into

evidence Johnson's grand jury testimony after Johnson testified that he did not

remember what occurred on the day of the homicide. (Doc. 1 at 12–13)

At a bench conference, the trial court overruled trial counsel's objection to the

admission of Johnson's grand jury testimony as follows (Doc. 12-2 at 1377–80):

| | |
|---|---|
| [Trial counsel:] | Your Honor, impeachment is not substantive evidence. |
| [Prosecutor:] | This isn't going to be impeachment, Judge. I had planned to admit it as a prior consistent statement. |
| [Trial court:] | Prior consistent statement before the grand jury can be considered as substantive evidence. |
| [Prosecutor:] | I also intend to admit the conversation between Mr. Johnson and the CI which occurred prior to the grand jury which is also a prior consistent statement. |
| [Trial counsel:] | But he hadn't made a statement. |
| [Prosecutor:] | Him acting as though he doesn't remember, I am going to ask the court to make a finding that his memory is faulty and based on that he is going to say that |

the testimony comes in as prior consistent statements.

[Trial court:]   What I am looking at is Ehrhardt section 801.7, which allows for testimony before grand juries and *State v. Delgado Santos* that it can be admitted as substantive evidence.

[Prosecutor:]   Judge, what my intention would be is to establish that he remembers giving the statement to the grand jury and he was under oath.

I am going to ask the court to make a finding. I am going to ask a few more questions, ask the court to make a finding that his memory loss is not a legitimate memory loss and at that point I will not ask him any further questions and intend to admit the prior consistent statement of the grand jury through the reading of the grand jury testimony via myself and Mr. Wilson into the record and then I'll get into the CI statement through the confidential source.

[Trial court:]   Okay. Well, he is — to me it's basically — I think my impression is that he's feigning any ability to remember anything about that evening. So in this case *State versus Delgado*, it is —

[Prosecutor:]   And I do have the case law. I pulled it in preparation of this, Judge.

[Trial court:]   I always have [it] to understand.

[Prosecutor:]   Thank you, Judge.

[Trial counsel:]   Your Honor, I object to the reading of the grand jury testimony. I object to the State's plans on calling Mr. Barton further. I will have a more specific objection to him testifying to what was said to him regarding the statements that were made to him as hearsay.

| [Trial court:] | To who? |
|---|---|
| [Prosecutor:] | The source. |
| [Trial court:] | The source. |
| [Prosecutor:] | The one that's being recorded and Mr. Johnson. |
| [Trial court:] | Move forward. I'm overruling the objection. |

After excusing the jury, the trial court offered more reasons for the ruling

(Doc. 12-2 at 1381–87):

| [Prosecutor:] | And I am going to ask the court to make a finding on the record regarding Mr. Johnson's memory loss. |
|---|---|
| [Trial court:] | Let's go ahead and remove Mr. Johnson. |
| | And my finding concerning Mr. Johnson is based on observing him and listening to the answers to the questions — it's my opinion that he's feigning or faking an inability to remember anything about this particular night. |
| | Therefore, I think that his testimony that he doesn't remember anything having admitted that he did appear in front of the grand jury, gave sworn testimony then and that what he's telling us today is inconsistent and therefore under the case that I earlier mentioned, *State v. Delgado Santos*, which appears at 471 So. 2d 74, and an earlier case of *Moore v. State*, 452 So. 2d 559, where it says, "Grand jury testimony qualifies as testimony given under oath in a different proceeding and grand jury testimony inconsistent with trial testimony is admissible as substantive evidence." |

[Prosecutor:]          Judge, the State's [going to] ask the court to instruct the jury of such when they come back in.

And it would be the State's intention that myself along with Mr. Wilson from my office will read the grand jury testimony. I'll act as the prosecutor, which I was at the grand jury, and Mr. Wilson will act as Mr. Johnson in the responses that he gives.

We have prepared a transcript of the — a copy of the transcript for the jurors if the Court desires that they have a copy to read along with.

[Trial court:]         No. This is not a transcript of a —

[Prosecutor:]          Recorded statement.

[Trial court:]         — recorded statement. This is a transcript. So this would be reading rather than them having that transcript to view.

[Prosecutor:]          We did that just in an abundance of caution, Judge.

[Trial counsel:]       Your Honor, if I can make my objection a little bit more specific.

[Trial court:]         Sure.

[Trial counsel:]       I object to the reading of the grand jury testimony based upon it not being an inconsistent statement.

The State is offering this for being a consistent statement with something he didn't say on the stand. And it's not inconsistent with anything he said on the stand. What he said on the stand was that he doesn't remember.

That's the factual basis for my objection. The legal basis is that it violates the hearsay rule, Florida Section 90.801 and

90.802. There's no hearsay exception for the grand jury testimony.

It was not a deposition to perpetuate testimony. There was no ability to cross-examine him during the grand jury. I was not invited nor were any attorneys for Mr. Sweet invited to the grand jury nor would they have been invited.

Additionally, Your Honor, it violates *Crawford v. United States*. Additionally, it violates Mr. Sweet's right to confront his witnesses per the United States Constitution and the Florida Constitution.

[Trial court:]   We will keep — make sure Mr. Johnson's not sent back.

After the statement is read, you will have an opportunity to have him called back to the stand to further cross-examine him on his — what's been said if that's your desire.

[T]he case I referred to references Florida Statute Section 90.801 and it references 90.801 sub-two, sub-A. Where sub-two says the statement is not hearsay if the declarant testifies at trial or hearing, is subject to cross-examination concerning the statement, and the statement is inconsistent with the declarant's testimony given under oath subject to penalty of perjury at trial, hearing, or other proceeding.

The case I alluded to, *State versus Delgado*, [ ] — and also there's a case cited in Ehrhardt, *Hills v. State*, 428 So. 2d, [ ] stand for the proposition that grand jury testimony which is inconsistent with trial testimony is admissible as substantive evidence as being an inconsistent statement from a "other proceeding."

In this instance, again based on the testimony by Mr. Johnson here in court, it is my conclusion that he is feigning or faking lack of memory for the events in question.

And there's a case that says a witness's feigned memory loss can be considered inconsistent of the rule. And that is citing United States Court of Appeals at 517 F.3d 751.

[Prosecutor:]    Judge, I actually have that case. It's *United States v. Cisneros-Gutierrez* from February of 2008.

[Trial court:]    That's exactly what I was looking at here. And Cisneros apostrophe — not apostrophe, hyphen, [Gutierrez]. Okay.

. . .

[Trial counsel:]    Well, just to put some additional material on the record. It kind of puts me in an awkward position because my planned cross-examination was contingent upon him actually testifying and the State's offer for him was contingent upon his truthful testimony. I assume that the State's not making him any offers at this point.

[Prosecutor:]    Judge, I'm not — I mean I don't think I need to put that on the record at this point. I mean the offer was contingent upon him having truthful testimony and he obviously didn't do that.

[Trial court:]    So he will be able to have him brought back and on cross-examination discuss with him offers being made.

[Prosecutor:]    If he so chooses, he can do that.

[Trial court:]    Need to keep Mr. Johnson available and have him brought back at the conclusion

> of the reading of this even if it's early
> afternoon.

Section 90.801(2)(a), Florida Statutes, authorizes the admission of a statement "if the declarant testifies at the trial [ ] and is subject to cross-examination concerning the statement and the statement is:  [i]nconsistent with the declarant's testimony and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding or in a deposition."

*Moore v. State*, 452 So. 2d 559, 561–62 (Fla. 1984), explains why grand jury testimony qualifies as a statement that "was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding":

> The Law Revision Council notes indicate that section 90.801(2)(a) was inspired in part by Federal Rule of Evidence 801(d)(1), which requires the statement to have been given under oath, subject to the penalty of perjury, at a trial, hearing, or deposition. As is indicated below, Rule 801(d)(1) has been interpreted as including statements given under oath before a grand jury. Because section 90.801(2)(a) was patterned after Federal Rule of Evidence 801(d)(1), we should construe the former in accordance with federal court decisions interpreting the latter. *See, e.g.*, *Hightower v. Bigoney*, 156 So. 2d 501 (Fla. 1963).
>
> The use of prior inconsistent statements as substantive evidence was held by the United States Supreme Court not to be in violation of the confrontation clause of the sixth amendment in *California v. Green*, 399 U.S. 149 (1970). In response to that decision Congress enacted Federal Rule of Evidence 801(d)(1)(A) which uses language identical to that in section 90.801(2)(a). The federal courts have found that Congress in adopting this rule specifically intended to authorize the use of inconsistent statements given in a grand jury proceeding as substantive evidence.
>
> . . .
>
> We therefore hold that under section 90.801(2)(a), Florida Statutes (1981), the prior inconsistent statement of a witness at

> a criminal trial, if given under oath before a grand jury, is
> excluded from the definition of hearsay and may be admitted
> into evidence not only for impeachment purposes but also as
> substantive evidence on material issues of fact. We believe that
> the constitutional right of the accused to confront the witnesses
> against him requires that the declarant testify at the trial or
> hearing at which the state seeks to introduce the prior statement
> as substantive evidence. Section 90.801(2)(a) safeguards this
> right by requiring that the declarant appear as a witness and be
> available for cross-examination.

At trial, Johnson testified that he did not remember events that occurred on the day of the homicide. (Doc. 12-2 at 1375–76) He denied that Sweet confessed to his committing the robbery and the homicide. (Doc. 12-2 at 1376) The trial court observed Johnson's demeanor and determined that Johnson feigned his inability to recall the events. (Doc. 12-2 at 1385) A federal court presumes that the trial court's factual determination is correct, and Sweet fails to rebut the factual determination with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Because Johnson testified before the grand jury about events that occurred on the day of the homicide and feigned his inability at trial to recall those events, Johnson's trial testimony was inconsistent with his grand jury testimony. *Mitchum v. State*, 345 So. 3d 398, 402 (Fla. 1st DCA 2022) ("A witness's trial testimony that he does not remember the events at issue is not necessarily contradictory of his previous statements describing those events. However, such testimony is contradictory when there is evidence suggesting that the witness's claimed memory loss is insincere.") (citations omitted). *See also United States v. Mornan*, 413 F.3d 372, 379 (3d Cir. 2005) ("Although this Court noted [ ] that a prior statement should not be admitted if the witness's current memory loss regarding that statement is genuine, we join several

other circuits in holding that a prior statement may be admitted under Rule 801(d)(1)(A) *where the witness's memory loss is not genuine*.") (italics in original and citations omitted).

After the prosecutor introduced into evidence Johnson's grand jury testimony, the trial court offered trial counsel an opportunity to cross-examine Johnson about his testimony, but trial counsel declined.  (Doc. 12-2 at 1419)

Because Johnson testified under oath before the grand jury, and the trial court offered trial counsel an opportunity to cross-examine Johnson at trial, the trial court correctly overruled trial counsel's objection to the admission of the grand jury testimony.  § 90.801(2)(a), Fla. Stat.  Also, because Sweet fails to demonstrate that the admission of Johnson's testimony before the grand jury violated his federal right to due process, the trial court did not unreasonably deny the federal due process claim.  *Thigpen v. Thigpen*, 926 F.2d 1003, 1011–12 (11th Cir. 1991).

Sweet argues that the trial court unreasonably applied *Morton v. State*, 689 So. 2d 259 (Fla. 1997), and *United States v. Peterman*, 841 F.2d 1474 (10th Cir. 1988), by permitting the prosecutor to call Johnson to testify only to impeach Johnson.  (Docs. 1 at 12–13 and 7 at 17)  Because the phrase "clearly established Federal law" under Section 2254(d)(1) encompasses only a holding by the United States Supreme Court, a misapplication of either *Morton* or *Peterson* entitles Sweet to no relief.  *Williams*, 529 U.S. at 412.  Also, *Morton*, 689 So. 2d at 263, cited *Peterman*, 841 F.2d at 1479 n.3, to explain that "the federal courts have consistently limited the government in criminal cases from using a prior

inconsistent statement under the guise of impeachment where the primary purpose is to place before the jury substantive evidence which is otherwise inadmissible."

*Maya v. State*, 363 So. 3d 1191, 1194 (Fla. 6th DCA 2023) (footnotes omitted), explains why *Morton* does not apply to grand jury testimony admitted under Section 90.801(2)(a):

> The *Morton* court recognized the potential for abuse by a prosecutor who might call a witness the prosecutor expects to testify contrary to earlier statements, merely for the purpose of impeaching the witness by introducing the prior statements the prosecutor wants to get before the jury. The prosecutor's hope is that the jury will not limit its use of the evidence to impeachment but will use it also to substantively support the State's case. With that in mind, the *Morton* court held that when "a party knowingly calls a witness for the primary purpose of introducing a prior statement which otherwise would be inadmissible, impeachment should ordinarily be excluded." *Morton*, 689 So. 2d at 264.

> In the present case, it is sensible to assume the State called Tia for the primary purpose of introducing her grand jury testimony; however, this did not violate the rule in *Morton*. *Morton* disallows evidence "otherwise inadmissible." Unlike prior inconsistent statements that may be used only for impeachment, prior grand jury testimony is not hearsay and may be used as substantive evidence. § 90.801(2)(a), Fla. Stat. (2021); *Moore v. State*, 452 So. 2d 559, 562 (Fla. 1984).

> Maya argues that the same policy considerations in *Morton* exist in his case, so the *Morton* rule should apply. We cannot agree. The policy *Morton* sought to enforce is that a jury is not permitted to use impeachment evidence as substantive evidence. Accordingly, the State should not be permitted to intentionally put before the jury testimony, inadmissible as substantive evidence, with the hope that the jury will not be capable of following the court's instructions that the evidence may be used solely for impeachment. In Maya's case, there is no danger the jury would be confused or improperly consider impeachment evidence as substantive evidence because the grand jury testimony was not offered as impeachment evidence; it was substantive evidence properly admitted under section 90.801(2)(a).

Lastly, Johnson testified about his memory loss (Doc. 12-2 at 1375–77, 1380), the trial court afforded trial counsel an opportunity to cross-examine Johnson (Doc. 12-2 at 1419), and trial counsel argued in closing that the jury should ignore Johnson's inculpatory grand jury testimony because of his memory loss. (Doc. 12-2 at 1588–89)  Because the trial court offered trial counsel an opportunity to confront Johnson and in closing trial counsel attacked Johnson's credibility, the trial court did not unreasonably deny Sweet's federal right to confrontation.  *United States v. Owens*, 484 U.S. 554, 558 (1988) ("'The Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion.  To the contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness's testimony.'") (quoting *Delaware v. Fensterer*, 474 U.S. 15, 21–22 (1985)).  Ground four is denied.

## V.  <u>ISSUE ON POST-CONVICTION</u>

### <u>Ground One:</u>

Sweet asserts that the trial court violated his federal right against cruel and unusual punishment by not considering mitigating factors related to youth at sentencing.  (Doc. 1 at 5–7)  The post-conviction court denied-in-part the claim as follows (Doc. 12-2 at 706–07) (state court record citations omitted):

> Following a jury trial, the Defendant was convicted and
> sentenced to life in state prison with a twenty-five-year

minimum mandatory sentence, with eligibility for parole after the twenty-five-year minimum mandatory, for first-degree murder. The Defendant received twenty-year concurrent sentences on counts two through five for attempted armed robberies with a twenty-year minimum mandatory sentence on each count, and a five-year concurrent sentence for tampering with evidence. The Defendant committed the offenses when he was seventeen years old.

The Defendant was sentenced on March 19, 2014. This occurred after the United States Supreme Court decided *Graham v. Florida*, 560 U.S. 48 (2010) and *Miller v. Alabama*, 567 U.S. 460 (2012), but prior to the enactment of § 921.1401, Florida Statutes. Cognizant of the flux in law regarding sentencing of juvenile offenders, the court applied then existing case law, including *Toye v. State*, 133 So. 3d 540 (Fla. 2d DCA 2014), and determined that while *Miller* prohibits imposition of a mandatory life without parole sentence on a juvenile offender, a life sentence could be imposed after considering certain factors. As § 921.1401, Florida Statutes, did not exist, the sentencing Court looked at Sections 921.0026 and 921.141, Florida Statutes, along with other non-statutory factors which applied in this case.

In the Defendant's first sub-claim of [this ground], he argues the imposition of the life sentence with the possibility of parole is an improper sentence. In *Horsley v. State*, 160 So. 3d 393 (Fla. 2015), the Florida Supreme Court held statutory revival for sentencing of life with the possibility of parole after twenty-five years was inappropriate. This was the theory relied upon by the sentencing court. Therefore, the Defendant is correct in part, in that the term providing for the possibility of parole after twenty-five years should be stricken.

The Defendant's second sub-claim however alleges he is also entitled to a new sentencing hearing pursuant to chapter 2014-220, Laws of Florida. In those cases in which juvenile offenders were granted new resentencing hearings who were sentenced after *Miller*, but before the effective date of Chapter 2014-220, Laws of Florida, the sentencing courts failed to provide the requisite individualized sentencing hearing. *See Horsley v. State*, 160 So. 3d 393 (Fla. 2015); *Moyer v. State*, 184 So. 3d 1185 (Fla. 2d DCA 2015); *Ortiz v. State*, 188 So. 3d 113 (Fla. 1st DCA 2016); *Williams v. State*, 171 So. 3d 143 (Fla. 5th DCA 2015). However, at sentencing, the Court did provide the Defendant with an individualized hearing as required pursuant to *Miller*. Citing to the mitigating factors

provided in Sections 921.0026 and 921.141, Florida Statutes, as
well as other specific factors applicable to this case, the
sentencing court considered factors analogous to those now
enumerated in Section 921.1401, Florida Statutes. As such, the
defendant is not entitled to a re-sentencing hearing.

Nonetheless, the Defendant is entitled to some meaningful
opportunity for release. The appropriate remedy is, as the State
suggests, to amend his sentence providing for subsequent
judicial review after twenty-five years. *See also Ejak v. State*,
230 So. 3d 566 (Fla. 2d DCA 2017). The Defendant's
concurrent sentences of twenty years on counts two through
five and concurrent sentence of five years on count six are not
subject to judicial review. *See* § 775.082(3), Fla. Stat.

At sentencing, the trial court considered mitigating factors required by *Miller*

before imposing a life sentence (Doc. 12-2 at 1001–05):

|  |  |
|---|---|
| [Trial court:] | Let me just put first — grieving. One of the bad things about sitting where I have to sit in these types of cases, it is very emotional for all of those involved, not only for the families and friends of the victim, but also the families and friends of — of the defendant, having been found guilty, so that's not lost on me. First to put this in a legal contest — context — Mr. Sweet, if it weren't for the United States Supreme Court having enter[ed] their order in *Miller v. Alabama*, you'[d] be facing under Florida law mandatory life in prison for this felony murder. The cases provided by the — address[ed] by the State, I have read. I have located that *Copeland* case, it took me back to both [the] *Washington* and *Ortiz* cases, and I understand that according to the First District that the court has [ ] available to it the opportunity to still impose life without parole with — just [ ] life imprisonment. So, I understand that is an alternative of the courts. I've done further research and for purposes of the record there is a case that is yet to be published, but it's *Toye* [ ] *v. State*, which is not published in Westlaw [ ] yet. |

[Trial counsel:]      I actually have it, too.

[Trial court:]      It is cited at 2014 Westlaw 228639, again the opinion has not been released for publication, but it was disseminated. And it sets the Second District Court of Appeals initial evaluation of this issue. And what I was drawn to — is the fact that the Second District sent it back to the trial court without any specific instructions or guidance. Judge Villanti in his concurring opinion sets forth what he believes [ ] would be appropriate guidance to the trial court. And he sets forth the concept of what he described as being statutory revival. Basically saying that the court having not — not having a specific statute to apply should go back to the last statute that was in place addressing this issue. Judge Altenbernd also concurs and provides his thoughts on the subject, so the concurring opinion is not binding, but it is kind of where I am and informative [to] what needs to be done.

      The bottom line from a legal point of view — Mr. Sweet is, but for the *Miller v. Alabama* case, you would be facing life in prison without any possibility of parole. [I]n this case I have used that *Toye* case as kind of guidance in [a] framework, but I also understood that my role is to determine what mitigators exist. [A]nd what I did to kind of evaluate that is I went back and read Florida Statute Section 921.0026 and 921.141 which deal with statutory mitigators that are available just generally and those that are available in regard to mitigation against the imposition of a death sentence. I used those just [as] kind of categories to look at. I've also done some further research on — just the additional non-statutory aggravators that do apply.

And along those lines — Mr. Sweet you were young at the time this occurred — seventeen and a few months. [Y]our family — I had an opportunity to observe during the course of the trial and hear testimony from —, likewise [ ] I had an opportunity to see you. And you know one of the things that disturbs me about this is you give me the appearance of being an intelligent, educated young man. [A]nd having gotten involved in what occurred here. You do have a history in the juvenile system which causes some concern. [B]ut the facts are in the crime. Let me address that. I mean based on what the jury verdict and my observation of the evidence is that you made a conscience choice to go out and attempt to rob somebody. This is a classic felony murder. And a felony murder is when somebody is engaged in illegal activity such as a robbery and somebody got — gets killed that — that rises to the level of first-degree murder being a felony murder, a death occurring in the context of an ongoing — robbery.

I fully believe that when you entered that alley that you had no intent to kill anyone. You had formed the intent to rob them. I believe that you raised the gun to them. The gun was cocked and by the involvement of somebody just stepping into that situation and knocking your hand out of the way, that gun went off. So, I am convinced that it was an accident; however, the accident also set up by your willingness to approach people with a loaded and cocked gun. [S]o the stage was set for a serious consequence of your chosen action.

[W]hat I am — doing in this case with regard to the first-degree murder charge — I am finding you guilty and adjudicating you guilty of first-degree felony murder. I am sentencing you to life in prison with

a twenty-five-year mandatory minimum.
You will be eligible for parole after the
twenty-five-year mandatory minimum is
served. I'm not going to choose to put you
on probation because probation will allow
you in essence automatically to be
released at that point. I think it's more
appropriate that you, during your course
of incarceration, prove to those that will
make a decision the fact that you have
changed and are no longer a risk or
danger to the community and could
consider parole. So it's in essence — not
specifically — relying on Judge Villanti's
observation, but using that as — guidance
here, that's an appropriate sentence with
twenty-five — I'm sorry, life in prison
with no eligibility for parole for
twenty-five years. Those first twenty-five
years pursuant to Florida Statute Section
775.087 is a mandatory minimum.

The trial court did not impose a mandatory sentence of life in prison without

parole. The trial court instead considered aggravating and mitigating circumstances,

including Sweet's age at the time of the offense, his intelligence, his criminal history,

his participation in the offense, the nature and circumstances of the offense, the effect

of the offense on the victim's family and Sweet's family, and the likelihood that

Sweet will rehabilitate, before imposing a life sentence with review after twenty-five

years.

Because the trial court neither violated Sweet's federal right against cruel and

unusual punishment nor unreasonably applied *Miller*, the post-conviction court did

not unreasonably deny the claim. *See Montgomery v. Louisiana*, 577 U.S. 190, 195

(2016) ("*Miller* required that sentencing courts consider a child's 'diminished

culpability and heightened capacity for change' before condemning him or her to die

in prison.  Although *Miller* did not foreclose a sentencer's ability to impose life

without parole on a juvenile, the Court explained that a lifetime in prison is

a disproportionate sentence for all but the rarest of children, those whose crimes

reflect 'irreparable corruption.'") (citation omitted).  Ground one is denied.

## VI.  INEFFECTIVE ASSISTANCE OF COUNSEL

Sweet claims ineffective assistance of counsel, a difficult claim to sustain.

"[T]he cases in which habeas petitioners can properly prevail on the ground of

ineffective assistance of counsel are few and far between."  *Waters v. Thomas*,

46 F.3d 1506, 1511 (11th Cir. 1995) (quoting *Rogers v. Zant*, 13 F.3d 384, 386

(11th Cir. 1994)).  *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998), explains

that *Strickland v. Washington*, 466 U.S. 668 (1984), governs an ineffective assistance of

counsel claim:

> The law regarding ineffective assistance of counsel claims is
> well settled and well documented. In *Strickland v. Washington*,
> 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the
> Supreme Court set forth a two-part test for analyzing ineffective
> assistance of counsel claims. According to *Strickland*,
>
> > First, the defendant must show that counsel's
> > performance was deficient. This requires showing
> > that counsel made errors so serious that counsel
> > was not functioning as the "counsel" guaranteed
> > the defendant by the Sixth Amendment. Second,
> > the defendant must show that the deficient
> > performance prejudiced the defense. This
> > requires showing that counsel's errors were so
> > serious as to deprive the defendant of a fair trial,
> > a trial whose result is reliable.

"[T]here is no reason for a court deciding an ineffective assistance claim . . .

to address both components of the inquiry if the defendant makes an insufficient

showing on one." *Strickland*, 466 U.S. at 697.  "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  466 U.S. at 690.  "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  466 U.S. at 690.  *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  466 U.S. at 690.

Sweet must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."  *Strickland*, 466 U.S. at 691.  To meet this burden, Sweet must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694.

Sweet cannot meet his burden by showing that the avenue chosen by counsel proved unsuccessful.  *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992). *Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Strickland*, 466 U.S. at 690–91.

Sustaining a claim of ineffective assistance of counsel under Section 2254(d) is very difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted). *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) ("Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'") (quoting *Johnson v. Sec'y, Dep't Corrs.*, 643 F.3d 907, 911 (11th Cir. 2011)).

In determining "reasonableness," Section 2254(d) authorizes determining only "whether the state habeas court was objectively reasonable in its *Strickland* inquiry" and not independently assessing whether counsel's actions were reasonable. *Putman v. Head*, 268 F.3d 1223, 1244 n.17 (11th Cir. 2001). The presumption of correctness and the highly deferential standard of review require that the analysis of each ground begin with the state court's analysis.

## A.  Grounds of IAC Before and During Trial

**Ground Five:**

Sweet asserts that trial counsel deficiently performed by calling Sweet's mother to testify at trial. (Doc. 1 at 14–15) The post-conviction court denied the claim as follows (Doc. 12-2 at 195) (state court record citations omitted):

> Defendant asserts trial counsel was ineffective by introducing damaging evidence and failing to develop a coherent alibi defense. Defendant alleges that his defense was alibi and misidentification. Defendant asserts that counsel called Defendant's mother, Lekisha Covington, who testified that on the night of the incident she was home all day and at no time

did Defendant leave the house. But counsel then called
Defendant's sister, Rian Covington, and cousin, Moninika
Patterson, who testified that his mother was not home until
7:00 A.M. the day of the murder. Defendant asserts that the
false testimony of Lekisha Covington severely hampered his
development of a coherent theory of alibi defense. Defendant
states that counsel was deficient for calling Ms. Covington as
an alibi witness when she was not home on the night in
question. He asserts that but for counsel's performance the
outcome of the proceeding would have been different and he
would have been acquitted of all charges.

First, the record indicates that Ms. Covington did not testify
that she was home all day, as Defendant claims. Rather,
Ms. Covington, Defendant's mom, testified that she knew
Defendant was home all night. Defense counsel addressed
Ms. Covington's testimony in closing statements, arguing that
Ms. Covington, as Defendant's mom, knew he did not commit
the crimes.

Second, given all the other evidence at trial, the court finds
Defendant was not prejudiced. Although Defendant put on an
alibi defense using testimony from Rian Covington and
Moninika Patterson, as well as testifying on his own behalf,
multiple witnesses (Crawley, Monpremiere, and Johnson)
testified that Defendant was with them near the alley the night
of the murder and an eyewitness, Smith, testified that
Defendant was the person who attempted to rob him and his
friends and who shot the deceased victim.

The court finds Defendant was not prejudiced. The court also
finds that counsel was not ineffective. [The claim] is denied.

Sweet's mother testified that she knew that Sweet stayed home the evening of

September 9, 2011, until the morning of September 10, 2011, because she stayed

home (Doc. 12-2 at 495–97):

| [Trial counsel:] | I want to take you back in time a couple years — |
|---|---|
| [Mother:] | Okay. |
| [Trial counsel:] | — to September 9th and 10th of 2011. |
| [Mother:] | Yes. |

| | |
|---|---|
| [Trial counsel:] | September 9th, do you remember where your son was? |
| [Mother:] | Yes, he was home. |
| [Trial counsel:] | And where's your home? |
| [Mother:] | Well, it was located at the time at 507 Little Lake Court. |
| [Trial counsel:] | What city is that in? |
| [Mother:] | That was in Winter Haven. |
| [Trial counsel:] | And into the evening, did he leave the house? |
| [Mother:] | No, sir. |
| [Trial counsel:] | Into the late evening, did Mr. Sweet leave the house? |
| [Mother:] | No, sir. |
| [Trial counsel:] | Into the early morning of September the 10th, was Mr. Sweet at home? |
| [Mother:] | Yes, he was. |
| [Trial counsel:] | When you woke up in the morning, was he at home? |
| [Mother:] | Yes, he was. |
| [Trial counsel:] | Now, we're going back three years. And Mr. Sweet wasn't charged in this offense until ten months after September 10th, 2011. So going back in time, how do you know that your son was at the house on September 9th into the evening until the late morning on September 10th? How do you know that? |
| [Mother:] | Well, because, because my birthday was a week before the 9th, which was on the 3rd, and I went out with my girlfriends. |

|  | We went out of town. But my kids wanted to spend the week, my birthday week, with me. But it didn't go that way. I told them that — I promised them that I would — that we would do something the following week. |
|--|--|
|  | But we ended up not doing anything the following week because we found out about my niece. She has some form of cancer and they only gave her two to three weeks to live. And so we ended up not doing anything that weekend. |
| [Trial counsel:] | Who else was at the house on September 9th in the evening and into September 10th early morning? |
| [Mother:] | It was me, Sam, my daughter Rian, China, that's my daughter also, Kennedy, she's my daughter, and Jackson. I had just had Jackson. He was three months old. And Moninika and her three kids, Jalan, Jackson — Jalan, Jordan, and Jala. |

The post-conviction court unreasonably determined that (Doc. 12-2 at 195):

"[T]he record indicates that Ms. Covington did not testify that she was home all day, as Defendant claims.  Rather, Ms. Covington, Defendant's mom, testified that she knew Defendant was home all night."

In his post-conviction motion, Sweet alleged (Doc. 12-2 at 171–72): "Trial counsel called [Covington] [who] testified that on the night of the incident she was home all day and at no time did [Sweet] leave the house.  [Covington] said she was positive [Sweet] was home [from] late evening into the early morning of September the 10th and he never left the house."  At trial, Sweet's mother testified that she knew that Sweet stayed home the evening of September 9, 2011, until the morning of September 10, 2011, because she stayed home.  (Doc. 12-2 at 496–97)

Because the post-conviction court mischaracterized both the allegations in Sweet's post-conviction motion and the testimony by Sweet's mother, the post-conviction court unreasonably determined a fact.  28 U.S.C. § 2254(d)(2).  Both the trial transcript and Sweet's post-conviction motion clearly and convincingly rebut the post-conviction court's determination.  28 U.S.C. § 2254(e)(1).  Consequently, review of the claim on federal habeas is *de novo*.  *Jones v. Walker*, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008) ("[W]hen a state court's adjudication of a habeas claim 'result[s] in a decision that [i]s based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,' this Court is not bound to defer to unreasonably-found facts or to the legal conclusions that flow from them.") (quoting 28 U.S.C. § 2254(d)(2)).

At trial, Sweet asserted an alibi defense.  Trial counsel called Sweet's mother who testified that she stayed home with Sweet on the evening of September 9, 2011, until the morning of September 10, 2011.  (Doc. 12-2 at 496–97)  Trial counsel called Sweet's sister and Sweet's cousin who testified that Sweet's mother left home at 6:00 P.M. on September 9, 2011, and returned home at 7:00 A.M. on September 10, 2011.  (Doc. 12-2 at 505–11)  Sweet's sister and Sweet's cousin further testified that they stayed home with Sweet while Sweet's mother left to work.  (Doc. 12-2 at 501–02, 511–12)   The homicide occurred around 1:00 A.M. on September 10, 2011.  (Doc. 12-2 at 1054, 1244)

The testimony by Sweet's sister and Sweet's cousin directly contradicted the testimony by Sweet's mother and undermined Sweet's alibi defense.  Because Sweet

establishes that no competent counsel would present the contradictory testimony, Sweet demonstrates that trial counsel deficiently performed. *Hannon v. Sec'y, Dep't Corrs.*, 562 F.3d 1146, 1151 (11th Cir. 2009) ("There is a strong presumption that counsel's performance is reasonable, and to rebut that strong presumption, [a petitioner] must establish that no competent counsel would have taken the action that his counsel did take.") (citation and internal quotations omitted).

However, even under the less deferential *de novo* standard, Sweet cannot demonstrate prejudice under *Strickland*. Smith, a musician in the alley, identified Sweet as the male who attempted to rob the musicians and brandished a gun that discharged and killed Ameduri. (Doc. 12-2 at 1134–36) Crawley, Monpremeiere, and Johnson testified that, on September 9, 2011, Sweet stated that he either needed money or intended to "hit a lick," exited the car in Winter Haven near the bar, returned to the car after the three males heard a gunshot, and threw either a bag or a gun into a lake. (Doc. 12-2 at 1316–24, 1340–49, 1395–1403) A couple of days earlier, Sweet showed Johnson a revolver that Sweet had purchased. (Doc. 12-2 at 1397) On the night of the homicide, Crawley saw Sweet armed with the revolver. (Doc. 12-2 at 1313–15) Sweet confessed to Johnson that he attempted to rob several people with a gun, a male tried to knock the gun out of Sweet's hand, and the gun discharged and killed another male. (Doc. 1404–05) When a detective arrested Sweet for first-degree murder, Sweet responded by turning over photographs of the crime scene, pushing and pulling himself back and forth, and repeating, "No, no,

no." (Doc. 12-2 at 1292–93)  In a jail cell, Sweet dropped to his knees and begged, "Please, God, forgive me, help me." (Doc. 12-2 at 1293–94)

Because this overwhelming evidence proved Sweet's guilt, Sweet cannot demonstrate that the outcome at trial would change if trial counsel did not call Sweet's mother to testify, and the ineffective assistance of counsel claim is meritless. *Strickland*, 466 U.S. at 695–96 ("In making this determination [of prejudice], a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. . . .  [A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.").  Ground five is denied.

## Ground Six:

Sweet asserts that trial counsel deficiently performed by not adequately cross-examining Ryan Smith ("sub-claim A"), Stephen Venable ("sub-claim B"), Frank Csomos, and George Miller ("sub-claim C"). (Doc. 1 at 14–15)

### Sub-claim A

Sweet asserts that trial counsel deficiently performed by not adequately cross-examining Ryan Smith.  (Doc. 1 at 14)  The post-conviction court denied the sub-claim as follows (Doc. 12-2 at 190–91) (state court record citations omitted):

> Defendant asserts that counsel should have questioned Ryan Smith more thoroughly as to how Mr. Smith could identify Defendant as the perpetrator since the suspect was wearing something on his face and the lighting was bad in the alley. Defendant asserts counsel also should have asked Smith why the sketch provided to police did not show the suspect with a mask, and whether or not the suspect had any tattoos. Defendant alleges that he has tattoos on his neck that are very

conspicuous. Defendant asserts that had counsel effectively cross-examined Smith, he would have been acquitted.

The record reflects Smith testified the suspect had a "little strip of fabric across his face." Smith's sketch, which was introduced into evidence at trial, includes a depiction of a strip of fabric across the suspect's mouth. Additionally, the record indicates defense counsel did question Smith regarding the lighting in the alley, eliciting testimony that there was no light in the alleyway, the main light was coming from the street behind him, and the alleyway was "fairly dark."

Although counsel did not ask Smith regarding whether or not the suspect had any tattoos, the court finds Defendant was not prejudiced by his failure to do so. During trial, Mr. Smith identified Defendant as being the person who shot Ralph Ameduri and held him at gunpoint. The court notes counsel did file a pre-trial motion to suppress seeking to suppress Mr. Smith's identification of Defendant; that motion was denied following a hearing. However, Smith's testimony was not the only identification evidence presented at trial. The record indicates that the victim's murder was under investigation without arrest for ten months. It was not until law enforcement received a tip from a source, Dennis Barton, confirmed part of Barton's story, and then recorded a conversation between Barton and Eric Johnson, that Defendant was specifically identified and arrested. In addition to the testimony of Mr. Smith, the jury heard from Caleb Crawley, Alex Monpremiere, and Eric Johnson who all testified that they were with Defendant the night of the murder:

> Caleb Crawley testified that on the night of the murder, he saw Defendant with a revolver at a party; after the party Defendant was saying that he needed some money; Defendant tells Crawley to stop the car and gets out; Crawley hears a gunshot; and Defendant later threw a bag into the lake.

> Alex Monpremiere testified that Defendant said he needed some money and was going to do "a lick" (a robbery) to get some money; Defendant left the car; Monpremiere heard a gunshot and saw Defendant running towards the car; and Defendant later threw a gun into a lake. Monpremiere also testified that he realized someone had been shot and killed weeks later

> when he saw a suspect sketch on a wall;
> Monpremiere testified that the sketch resembled
> Defendant, and that's when he put together what
> happened that night.
>
> Eric Johnson's grand jury testimony was
> admitted [at] trial as substantive evidence.
> Johnson testified Defendant said he didn't want
> to go home broke and got out of the
> car; he knew Defendant had a .38 or .357
> revolver; he saw Defendant head towards the
> alley, heard two gunshots and Defendant got
> back into the car; and Defendant later got rid of
> the gun at a lake. Johnson also testified that
> Defendant had told him that he held up several
> people to rob them, a dude rushed him, and the
> gun went off.
>
> Given the foregoing, the court finds counsel was not ineffective,
> nor was Defendant prejudiced. [The claim], as to Ryan Smith,
> is denied.

At trial, Smith testified that the male who attempted to rob him was "a black guy that had like a little strip of fabric across his face." (Doc. 12-2 at 1122)  The prosecutor introduced into evidence the picture that the sketch artist drew based on Smith's description of the male (Doc. 12-2 at 1133), and the picture depicts a cloth covering the male's mouth.  (Doc. 12-2 at 206–07)  On cross-examination, Smith testified that the alley where the male approached the group was "fairly dark" and not illuminated.  (Doc. 12-2 at 1137)  Because Smith testified that a cloth covered the male's mouth and trial counsel cross-examined Smith about the lack of light in the alley, trial counsel did not deficiently perform, and the post-conviction court did not unreasonably deny the claim.  *Strickland*, 466 U.S. at 690.

Even though trial counsel did not question Smith about a tattoo on the male's neck, testimony by Sweet's friends proved that Sweet attempted to rob the musicians

and brandished a firearm that discharged and killed Ameduri.  (Doc. 12-2 at 1313–32, 1339–49, 1395–1404)  Also, after the detective showed Sweet photographs of the crime scene, arrested him for first-degree murder, and placed him in a jail cell, Sweet dropped to his knees and begged, "Please, God, forgive me, help me."  (Doc. 12-2 at 1293–94)  Because Sweet failed to demonstrate a reasonable probability that the outcome at trial would change if trial counsel further cross-examined Smith about a tattoo on the male's neck, the post-conviction court did not unreasonably deny the claim.  *Strickland*, 466 U.S. at 694.  *Wingate v. United States*, 969 F.3d 251, 257 (6th Cir. 2020) ("Considering 'the totality of the evidence before the . . . jury,' even a rigorous cross-examination of these witnesses could not have created the likelihood of acquittal necessary to undermine confidence in the jury's verdict.  Wingate was not prejudiced by his counsel's failure to cross-examine [the witnesses].") (citations omitted).

**Sub-claim B**

Sweet asserts that trial counsel deficiently performed by not adequately cross-examining Stephen Venable.  (Doc. 1 at 14–15)  The post-conviction court denied the claim as follows (Doc. 12-2 at 192–93) (state court record citations omitted):

> Defendant asserts trial counsel was ineffective for failing to cross-examine Stephen Venable as to whether or not Defendant's cell phone was picked-up on the phone towers in the area, and should have reiterated that the cell phone signal was from Eric Johnson's phone, not Defendant's. Defendant makes the general allegation that there is a reasonable probability the outcome of trial would have been different,

asserting that the testimony would have supported his alibi defense.

The record indicates that on direct examination the State never questioned Mr. Venable regarding whether or not Defendant's cell phone signal was picked-up on metroPCS's "392 Winter Haven" tower. When questioning Mr. Venable, the State focused on whether or not the cell phone of Johnson, a metroPCS subscriber, had "utilized tower number 392 Winter Haven" the night of the incident. The questioning of Mr. Venable followed the testimony of Johnson where he testified that he could not remember where he was on the night of the incident. Following a motion by the State, the court found that Johnson was feigning or faking an inability to remember anything about that particular night. As a result, the court admitted Johnson's grand jury transcript for consideration by the jury as substantive evidence. The testimony of Mr. Venable acted to place Johnson near the scene of the murder and robbery.

Whether or not Mr. Venable could actually testify regarding Defendant's cell phone signal at the area near the crime scene is speculation. If counsel had questioned Mr. Venable and Mr. Venable had testified that Defendant's phone signal was picked-up at the "392 Winter Haven" tower, counsel would have done a grave disservice to his client. Alternatively, it is possible that Defendant was not a metroPCS subscriber for whom Mr. Venable would have records. It is also possible that Defendant did not have a cell phone at all [or] did not have a cell phone with him the night of the incident [or] did not "utilize" his cell phone the night of the incident[.] The jury heard testimony from Detective Stephen Rusich that although they had Johnson's cell phone number, they were not able to get a cell phone number for Defendant.

The court finds counsel was not ineffective, nor was Defendant prejudiced. [The claim], as to Stephen Venable, is denied.

A detective testified that he learned the telephone number for Eric Johnson but did not learn the telephone number for Sweet.  (Doc. 12-2 at 1272)  Johnson testified that he did not remember traveling to Winter Haven with Sweet, Crawley, and Monpremiere, when the homicide occurred.  (Doc. 12-2 at 1375–76)  Stephen

Venable, a records custodian with metroPCS, testified that records from metroPCS showed that Johnson's telephone number connected to a telephone tower in Winter Haven near the homicide, when the homicide occurred.  (Doc. 12-2 at 1488–90, 1493–98)  Venable did not testify about Sweet's telephone number.

In his post-conviction motion, Sweet asserted that trial counsel deficiently performed by not asking Venable if Sweet's telephone number connected to the telephone tower in Winter Haven and by not arguing that Sweet's telephone number did not connect to the telephone tower.  (Doc. 12-2 at 167)  However, Sweet failed to submit evidence that demonstrated that Sweet possessed a mobile telephone when the homicide occurred and that Venable would testify that Sweet's mobile telephone did not connect to the telephone tower when the homicide occurred.  Because "[s]peculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation," the post-conviction court did not unreasonably deny the claim.  *Aldrich*, 777 F.2d at 636.

**Sub-claim C**

Sweet asserts that trial counsel deficiently performed by not adequately cross-examining Frank Csomos and George Miller.  (Doc. 1 at 14–15)  The post-conviction court denied the claim as follows (Doc. 12-2 at 193–94) (state court record citations omitted):

> Defendant asserts trial counsel was ineffective for failing to effectively cross-examine Frank Csomos and George Miller concerning the identity of the suspect, and regarding the lighting in the alley and that the suspect was wearing a mask. Defendant asserts their testimony would have impeached the testimony of Ryan Smith, who provided a sketch and in-court

identification, inasmuch as their testimony would have proven to the jury that it was impossible for anyone to actually identify the suspect. Defendant concludes that he would have been acquitted of all charges.

If counsel had questioned Mr. Csomos and Mr. Miller regarding the lighting in the alley and that the suspect was wearing a mask, that information would not have "impeached" the testimony of Mr. Smith. Mr. Smith testified that there was no light in the alleyway, the main light was coming from the street behind him, and the alleyway was "fairly dark." Mr. Smith also testified that the suspect was wearing a "little strip of fabric across his face," but nonetheless identified Defendant as the perpetrator.

Mr. Csomos testified that the suspect was a young black man with a dark shirt, white pants, and something over the bottom part of his face. Mr. Miller testified that the day of the incident he had been drinking and was impaired. He testified that it was "pretty dark" and that he could see a "small amount" of the person's face who had the gun. There was also testimony from David Wagner that Ralph Ameduri (the deceased victim) was the closest person to the shooter, and that Ryan Smith was the second closest. Mr. Wagner also testified that from his angle, he could not really see the man's face due to the back light behind his head.

The court finds that counsel was not ineffective, nor was Defendant prejudiced. Given all the other evidence at trial, including the testimonies of Alex Monpremiere, Caleb Crawley, and Eric Johnson, the court finds that confidence in the outcome is not undermined. [The claim], as to Frank Csomos and George Miller, is denied.

Csomos testified that he observed the robber approach from the street and described him as "a black man, young black man with a dark shirt, white pants, and with something over his — bottom part of his face." (Doc. 12-2 at 1094) Miller testified that he went to the alley to smoke a cigar, saw the robber approach, and described him as "a black male," but admitted that he could see only "a small amount of his face." (Doc. 12-2 at 1183) Because Csomos described "something"

covering part of the robber's face and Miller admitted that he could see only part of the robber's face, the post-conviction court reasonably determined that additional testimony by Csomos and Miller concerning a mask would not further impeach Smith.

Also, Smith testified that the male who shot Ameduri was "a black guy that had like a little strip of fabric across his face." (Doc. 12-2 at 1122) The prosecutor introduced into evidence the picture that the sketch artist drew based on Smith's description of the male. (Doc. 12-2 at 1133) On cross-examination, Smith testified that the alley where the male approached the group was "fairly dark" and not illuminated. (Doc. 12-2 at 1137) Because Smith admitted that the alley lacked lighting but still described and identified the robber, the post-conviction court reasonably determined that additional testimony by Csomos and Miller about the lack of lighting in the alley would not further impeach Smith.

Lastly, because the testimony by Crawley, Monpremiere, and Johnson proved that Sweet attempted to rob the musicians and brandished a firearm that discharged and killed Ameduri (Doc. 12-2 at 1313–32, 1339–49, 1395–1404), the post-conviction court reasonably determined that, even if trial counsel further impeached Smith's identification of Sweet as the robber, the outcome at trial would not change. Ground six is denied.

**Ground Seven:**

Sweet asserts that trial counsel deficiently performed by not calling Jovan Washington to testify at trial.  (Doc. 1 at 20–21)  The post-conviction court denied the claim as follows (Doc. 12-2 at 195–97) (state court record citations omitted):

> Defendant asserts counsel was ineffective for failing to investigate and call Jovan Washington that would have cast doubt on Defendant's guilt and impeached the testimony of Eric Johnson. Defendant asserts that Defendant informed counsel that Mr. Washington was willing and available to testify at trial that Eric Johnson told him that Defendant was not present during the crime, but he would tell the State what they wanted to hear because they were "on to him." Defendant concludes that Mr. Washington's testimony would have been used as impeachment and would have established why Johnson fabricated his grand jury testimony and provided an explanation as to his recantation of his grand jury testimony during trial.
>
> The record reflects counsel did investigate Mr. Washington; specifically, Mr. Washington's deposition was taken and counsel listed Mr. Washington on his amended discovery disclosure on January 16, 2014. In his deposition, Mr. Washington testified that he was in prison on the day Defendant was alleged to have committed the homicide. Mr. Washington also testified that every time he had news about the murder and robberies, he called defense counsel. He also testified that he heard on the streets that "they are really trying to save themselves." As Mr. Washington was incarcerated when the murder and robberies occurred, he had no relevant testimony that would cast doubt on Defendant's guilt. Further, even Mr. Washington's testimony that Eric Johnson told him that he [Johnson] would tell the State what they wanted to hear because they were "on to him" was admissible, *see Daeda v. State*, 841 So. 2d 632 (Fla. 2d DCA 2003), that would not have exonerated Defendant as he claims.
>
> The record also indicates a clear strategic reason why counsel would not have called Mr. Washington during trial. Specifically, during trial, Johnson testified that he did not remember being with Defendant the night of the shooting, did not remember being with Defendant when he threw a gun into a lake, and testified that Defendant never told him about

committing a robbery and shooting a man in the head. The
judge found Mr. Johnson was feigning loss of memory and
allowed his grand jury testimony to be introduced as
substantive evidence. Related to this issue, the State and
defense counsel knew of a statement of Johnson that was
surreptitiously recorded by Mr. Barton (Johnson's cousin) prior
to Johnson knowing that law enforcement was involved in the
case. The State moved to introduce that recording, which
included Johnson telling Mr. Barton what happened the night
of the murder, but defense counsel argued that while the
recorded conversation would quite possibly qualify as an
inconsistent statement (for Johnson), it could not come in as
there was no applicable hearsay exception. The State countered
that if defense counsel planned to cross-examine Johnson about
whether or not he was truthful in his testimony (*i.e.*, question
Johnson and then bring in Mr. Washington for impeachment
purposes), then the recorded statement of Johnson would be
relevant and admissible at that point. The court agreed that it
might be admissible in rebuttal given the State's scenario, but
denied the presentation of the recorded statement at that point
in time without prejudice if there was a later reason to admit it.

In summary, the record reflects that if counsel had called
Mr. Washington to testify with the intent of impeaching
Johnson's grand jury testimony, the State would have moved to
have Johnson's recorded statement, taken covertly while
Johnson was talking to his cousin and before he knew of law
enforcement's investigation, be introduced. The court had
indicated that such a statement might be admissible for that
rebuttal purpose. With the prior recorded statement of
Johnson excluded, counsel was able to characterize Johnson's
grand jury testimony as "completely self-serving" and proffered
that Johnson had something to hide. Counsel even argued
perhaps the actual perpetrator was " . . . Mr. Johnson who has
every reason not to want to testify today because maybe he got
out of the car and did the robbery."

During a deposition, Jovan Washington testified that he served a prison

sentence from January 5, 2011, until the end of January of 2012. (Doc. 12-2 at

213–15)  Because the homicide occurred on September 10, 2011 (Doc. 12-2 at 10),

the post-conviction court did not unreasonably determine that Washington lacked

knowledge of the homicide.

Also, during the deposition, Washington did not testify that "Johnson told him that [Sweet] was not present during the crime, but [Johnson] would tell the [prosecutor] what [he] wanted to hear because [he] was 'on to him.'" (Doc. 12-2 at 174)  Washington instead testified that Johnson told law enforcement that Sweet committed the homicide because Johnson "really tr[ied] to save [himself.]" (Doc. 12-2 at 218)  Because Sweet failed to present an affidavit or other testimony to demonstrate that Washington would testify in the manner that he contended, Sweet impermissibly supported his claim with speculation.  *Sullivan v. DeLoach*, 459 F.3d 1097, 1109 (11th Cir. 2006) ("This prejudice burden is heavy where the petitioner alleges ineffective assistance in failing to call a witness because 'often allegations of what a witness would have testified to are largely speculative.'") (citation omitted).

Lastly, the trial court sustained trial counsel's objection to the admission of the recorded conversation between Johnson and the confidential informant as follows (Doc. 12-2 at 1409–13):

| | |
|---|---|
| [Trial court:] | It's my understanding you wanted to address something at this point? |
| [Prosecutor:] | Your Honor, the Court has heard throughout the course of this trial that [there] was a recorded conversation between a confidential source and Mr. Johnson. |
| | Mr. Johnson was completely aware that he was being recorded. There is a conversation that takes place pretty much along the same lines as his grand jury testimony except that he's talking to a friend. |

Once the conversation ends and the CI takes Mr. Johnson back home, he meets back up with law enforcement and they take over the equipment.

It would be the State's intention at this point as an additional prior consistent statement, this statement was even made prior to the grand jury before Mr. Johnson even knew law enforcement was involved in this case, to play that statement.

I have taken the steps to redact that statement. Because it's like an hour and fifty minutes long, I believe. But I have pared it down substantially.

Because a lot of what they talk about is absolutely irrelevant and it has a lot of bad things in it both for Mr. Sweet and for Mr. Johnson and for the CI frankly.

So I pared it down to just kind of take all the peripheral stuff out so it only contains the conversation related to what Mr. Johnson tells the CI about what happened that night.

[Trial court:]       And, [trial counsel], what's your position on that?

[Trial counsel:]    Your Honor, Mr. Barton's statements and the statements that were elicited by Mr. Johnson during that time period is quite possibly a consistent statement but it doesn't conform with 90.801.

90.801, sub 2-B, is an important conjunctive there, [ ] and offered to rebut an expressed or implied charge against the declarant of improper influence, motive, or recent fabrication.

We don't have any of that, Your Honor. So it's not a hearsay exception to allow the conversation between Mr. Johnson and Mr. Barton into this trial.

| | |
|---|---|
| [Trial court:] | I mean — |
| [Prosecutor:] | Well, Judge, let me, let me say this. And — |
| [Trial court:] | I mean this is, this is — let me just — my thought, this is not a statement of the defendant. This is not a CI with the defendant. It is two completely — so it's no statement against interest — |
| [Prosecutor:] | Correct. |
| [Trial court:] | — at all. And it's just the — a recording of a — the CI engaging in conversation with Mr. Johnson. |
| [Prosecutor:] | Correct. And, Judge, and I may be jumping the gun a bit here. But it would be the State's intention and I believe the case law would support the fact that if [trial counsel] is going to cross-examine Mr. Johnson about whether or not he's getting any deals with truthful testimony, any of that sort of stuff, then I believe that it does become important because he would be implying that there would be recent fabrication if Mr. Johnson says anything and then his prior statement I believe does become relevant and is admissible at that point. |
| | So may we need to see what [trial counsel] is going to do with Mr. Johnson first. |
| [Trial court:] | It would seem to me that it might be admissible in rebuttal of some sort to that contention. But at this stage I mean it is not an admission against interest. It's two — it's a conversation between a CI and a prospective witness to this event. |
| | It is not any type of impeachment of what somebody says on the stand. I mean [you] might be able to use [the] prior statement |

> such as that for impeachment if
> Mr. Johnson were to say things
> completely different.
>
> But I am going to sustain the objection as
> far as the admissibility of that recorded
> statement between the CI and
> Mr. Johnson without prejudice if there's
> a later reason to admit it. But at this point
> I don't think it's relevant or admissible.

If trial counsel called Washington to testify that "Johnson told him that [Sweet] was not present during the crime, but [Johnson] would tell the [prosecutor] what [he] wanted to hear because [he] was 'on to him'" (Doc. 12-2 at 174), trial counsel would open the door to the admission of the recorded conversation between Johnson and the confidential informant that incriminated Sweet.  Johnson spoke with the informant before testifying at the grand jury proceeding (Doc. 12-2 at 1410), and Washington's testimony would imply that Johnson fabricated his grand jury testimony.  § 90.801(2)(b), Fla. Stat. ("A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is:  [c]onsistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of improper influence, motive, or recent fabrication.").

Trial counsel did not call Washington to testify and instead argued in closing that that the jury should ignore Johnson's inculpatory testimony before the grand jury because of his memory loss.  (Doc. 12-2 at 1588–89)  Because "[t]here is a strong presumption that counsel's performance is reasonable, and to rebut that strong presumption, [a petitioner] 'must establish that no competent counsel would have

taken the action that his counsel did take,'" the post-conviction court did not unreasonably deny the claim. *Hannon*, 562 F.3d at 1151 (citation omitted). Ground seven is denied.

## VII.  CONCLUSION

Sweet's application for the writ of habeas corpus (Doc. 1) is **DENIED**.  The clerk must enter a judgment against Sweet and **CLOSE** this case.

### DENIAL OF CERTIFICATE OF APPEALABILITY
### AND LEAVE TO APPEAL *IN FORMA PAUPERIS*

Because Sweet fails to demonstrate either a substantial showing of the denial of a constitutional right or that reasonable jurists would debate either the merits of the grounds or the procedural issues, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**.  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).  Sweet must obtain permission from the court of appeals to appeal *in forma pauperis*.

ORDERED in Tampa, Florida, on September 8, 2023.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE